UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

SCOT J. COHEN, et al,

                    Plaintiff,              09 Civ. 4003

     -against-                              OPINION

STEVE STEVANOVICH, et al,

                    Defendants.

------------------------------------X

```
 ┌─────────────────────────────────────┐
 │ USDC SDNY                            │
 │ DOCUMENT                             │
 │ ELECTRONICALLY FILED                 │
 │ DOC #: _____               │
 │ DATE FILED: 7/1/10                   │
 └─────────────────────────────────────┘
```

A P P E A R A N C E S:

          Attorney for Plaintiffs

          Weitzman Law Offices, L.L.C.
          110 Wall Street
          11th floor
          New York , NY 10005
          By: Raphael Weitzman, Esq.


          Attorneys for Defendants

          SULLIVAN AND CROMWELL, LLP
          125 Broad Street
          New York , NY 10004
          By:  Richard C. Pepperman, Esq.
               Richard H. Klapper, Esq.
               Tracy R. High, Esq.

          DAVIS POLK & WARDWELL, LLP
          450 Lexington Avenue
          New York , NY 10017
          By:  Robert F. Wise, Jr., Esq.
               William J. Fenrich, Esq.


          PROSKAUER ROSE LLP

1585 Broadway
New York , NY 10036
By:  Brian L. Friedman, Esq.
     Stephen L. Ratner, Esq.

O'MELVENY & MYERS LLP
7 Times Square
New York , NY 10036
By:  Andrew J. Frackman, Esq.
     Benjamin D. Petrosky, Esq.
     Brendan J. Dowd, Esq.

WILMER, CUTLER, HALE & DORR, LLP
399 Park Avenue
New York , NY 10022
By:  Fraser L. Hunter, Jr., Esq.

CADWALADER, WICKERSHAM & TAFT LLP
One World Financial Center
New York , NY 10281
By:  Gregory Arthur Markel, Esq.
     Martin L. Seidel, Esq.
     Peter Joseph Isajiw, Esq.

KIRKLAND AND ELLIS LLP
655 Fifteenth Street
Washington , DC 20005
By:  Andrew Brian Clubok, Esq.
     Jeffrey Landis, Esq.
     Beth Ann Williams, Esq.
     Daniel J Gomez, Esq.
     Maria Ginzburg, Esq.

**Sweet, D.J.,**

Scot J. Cohen, The Merav Abbe Irrevocable Trust, Abbe
Berman Foundation, Coleman Abbe, Cleveland Overseas Ltd., Philip
W. Mirabelli, Vertical Ventures, LLC, Martin D. Goldman, Ari S.
Goldman, Dan Burko, Abco Quality Engines & Transmissions, Inc,
and Ellis International, LP (collectively the "Plaintiffs") have
sued Morgan Stanley & Co. Incorporated, The Goldman Sachs Group,
Inc., J.P. Morgan Clearing Corp., JP Morgan Chase & Co., Banc of
America Securities LLC, Credit Suisse USA, Inc., Deutsche Bank
Securities Inc., Merrill Lynch, Pierce, Fenner & Smith
Incorporated, and UBS Securities, LLC (collectively, the
"Financial Institution Defendants"), among others, violations of
(i) the Securities and Exchange Act, 1934 (the "Exchange Act") -
Sections 9,10, 18, and 20, (ii) 17 C.F.R. § 240.10b-5; (iii)
conspiracy, and (iv) common law fraud.  The Financial
Institution Defendants have moved, pursuant to Federal Rule of
Civil Procedure 12(b)(6), to dismiss the Amended Complaint (the
"AC") for failure to state a claim upon which relief can be
granted.[1]  Pursuant to the authorities and conclusions set forth

---

[1] The AC improperly names The Goldman Sachs Group, Inc., JP Morgan Chase & Co.
and Credit Suisse USA, Inc. as defendants.  Those entities are parent
corporations not engaged in the activities alleged in the Complaint.  Because
Plaintiffs allege no independent basis for liability against them, those
companies do not belong as named parties in this action and are dismissed.
See, e.g., United States v. Bestfoods, 524 U.S. 51, 61 (1998) (stating that
it is a "general principle of corporate law . . . that a parent corporation .
. . is not liable for the acts of its subsidiaries.").

below, the motion is granted and the AC is dismissed as to the
Financial Institution Defendants.  Plaintiffs are granted leave
to replead.

## I.    PRIOR PROCEEDINGS

Plaintiffs' complaint was filed April 22, 2010 and was
amended on December 31, 2009, properly joining UBS Securities,
LLC, as a party in place of UBS Financial Services, Inc.

The instant motion was marked fully submitted on
January 25, 2010.

## II.   ALLEGATIONS OF THE AMENDED COMPLAINT

The AC generally asserts that "Defendants engaged in a
massive, illegal stock manipulation scheme." AC ¶ 2.  First,
Plaintiffs contend that "Defendants . . . have executed . . .
short sales of SulphCo stock without first borrowing the stock
or ensuring that the stock can be borrowed to settle the short
sale"—so-called "naked short sales."  Id.  Plaintiffs further
contend that "Defendants have intentionally failed to borrow
SulphCo stock to settle the short positions."  Id.  Second,
Plaintiffs claim that "Defendants orchestrated a wide-scale
predatory campaign of knowingly distributing false, and covertly

2

biased, written reports about SulphCo." Id. ¶ 3.  They state

that Geoffrey Tirman ("Tirman")(who is not alleged to be

affiliated with any Financial Institution Defendant) "approached

William Alpert, a reporter at Barron's Magazine, and bribed him

to write an article containing false and covertly biased written

reports about SulphCo." Id.  Plaintiffs assert that the

Financial Institution Defendants somehow "worked together with"

Tirman and Steve Stevanovich ("Stevanovich")(another

unaffiliated individual) "without disclosing the unscrupulous

collaboration." Id.

### 1. The Alleged Manipulation of SulphCo Stock

Plaintiffs contend that Defendants engaged "in a

series of transactions" that manipulated the price of SulphCo's

stock beginning in 2004. AC ¶ 2.  According to the AC, "from

October 26, 2005 [sic] and September 29, 2006, large quantities

of SulphCo shares were the subject of naked short selling." Id.

¶ 46.  Plaintiffs argue that the Financial Institution

Defendants "were motivated to intentionally fail to deliver

stocks allowing them to earn more money through the charging of

fees, commissions and/or interest through phantom securities

transactions." Id. ¶ 48.  And Plaintiffs assert, "[u]pon

3

information and belief," that "Defendants also profited from
naked short selling of SulphCo securities for their own
benefit." Id.

The AC does not identify any supposedly manipulative
naked short sales by any Financial Institution Defendant—or
anyone else. Instead, Plaintiffs allege that Defendants'
unidentified naked short sales resulted in similarly
unidentified "fails to deliver," which supposedly created
"phantom shares" of SulphCo stock and caused the number of
shares of SulphCo that are beneficially owned to exceed the
number issued by the company. Id. ¶¶ 46, 47, 49.[2]

## 2. The Alleged Scheme to Bribe the Barron's Reporter

---

[2] Plaintiffs allege that the creation of these so-called phantom shares
"artificially depressed" the price of SulphCo securities by "remov[ing] any
supply constraint on stock sales," thereby flooding the market with a
purportedly unlimited number of "phantom shares." Id. ¶¶ 39-41, 47, 49. The
SEC, however, has repeatedly rejected the notion that "fails to deliver"
create "phantom shares." See SEC, Division of Market Regulation: Responses
to Frequently Asked Questions Concerning Regulation SHO, at Question 7.1
(Jan. 3, 2005) available at
http://www.sec.gov/divisions/marketreg/mrfaqregshol204.htm (Declaration of
Richard C. Pepperman, II ("Pepperman Decl.") Ex. A); Brief for the SEC as
Amicus Curiae, 14-16, Nanopierce Techs., Inc. v. DTCC, 168 F.3d 73 (Nev.
2007) available at
http://www.sec.gov/litigation/briefs/nanopiercesecbrief.pdf (Pepperman Decl.
Ex. B); Brief for the SEC as Amicus Curiae, 16, Whistler Invs., Inc. v. DTCC,
539 F.3d 1159 (9th Cir. 2008) (Pepperman Decl. Ex. C).

4

The AC asserts that "Defendants orchestrated a wide-scale predatory campaign of knowingly distributing false, and covertly biased, written reports about SulphCo." AC ¶ 3. Plaintiffs state that "Defendants posted negative information about SulphCo" in "Barron's Magazine and Barron's Online." Id. ¶ 42. The AC does not quote or describe this "negative information," explain how it was false or misleading, or identify the Defendant that supposedly posted it. Plaintiffs simply assert that these reports contained "plenty of innuendos." Id.

The only specifics alleged in the AC relate to a January 23, 2006 article that appeared in Barron's. See William Alpert, A Crank Case, Barron's Magazine, Jan. 23, 2006, at 42. Plaintiffs contend that "Defendant TIRMAN approached William Alpert, a reporter at Barron's Magazine and bribed him to write an article containing false and covertly biased written reports about SulphCo." AC ¶ 3. Plaintiffs assert that "[t]he article failed to disclose that the Defendants controlled its content, and that the article was not independent and objective analysis of their target." Id. ¶ 45. According to the AC, "[t]he article does not discuss the technology of SulphCo, but engages in plenty of innuendos about [SulphCo's founder] and his educational background." Id. ¶ 3. Plaintiffs allege that the

price of SuphCo stock "drastically dropped" following the
publication of the Barron's article.   Id.

The AC pleads no facts regarding Tirman's purported
bribe or the Financial Institution Defendants' supposed
connection with it or the Barron's article.   The AC is silent
concerning the amount of the alleged bribe, when it was
supposedly made, or who was present at the time.   Nor does the
AC allege that any Financial Institution Defendant ever spoke to
Alpert regarding SulphCo, much less offered him an inducement to
publish an unflattering article.   Similarly, Plaintiffs allege
no facts to support their conclusory assertion that the
Financial Institution Defendants somehow "controlled the timing
of the release and dissemination" of reports in Barron's.   Id.
¶ 44.

## III. **THE LEGAL STANDARD**

"When considering a motion to dismiss, the complaint
is liberally construed, accepting all factual allegations in the
complaint as true, and drawing all reasonable inferences in the
plaintiff's favor." In re Tommy Hilfiger Sec. Litig., No. 04-CV-
7678, 2007 U.S. Dist. LEXIS 55088, at *5 (S.D.N.Y. July 20,
2007) (internal quotation marks and citations omitted). A

complaint must allege "enough factual matter (taken as true)" to suggest that a violation occurred, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable . . ." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556 (2007) (emphasis added; citation omitted). The pleading need only contain "[f]actual allegations. . . [sufficient] to raise a right to relief above the speculative level." Twombly, 550 U.S. at 556. "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Ashcroft v. Iqbal, No. 07-CV-1015, __ U.S. __, 129 S. Ct. 1937, 1940-41 (2009).

        "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Ashcroft, 129 S. Ct. at 1949. For elements of claims subject to Rule 8(a), Twombly requires more than pleading the "bare elements of [the] cause of action," but far less than the particularity of pleading required under Fed. R. Civ. P. 9(b). See id. at 1954.

        Under Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5, 17 C.F.R. 240.10b-5(b), a plaintiff

7

must plead six elements in order to demonstrate securities
fraud: (1) a material misrepresentation or omission; (2)
scienter; (3) a connection between the misrepresentation or
omission and purchase or sale of a security; (4) reliance; (5)
economic loss; and (6) loss causation. Heller v. Goldin
Restructuring Fund, L.P., 590 F. Supp. 2d 603, 613 (S.D.N.Y.
2008) (citations omitted). The heightened pleading standard
under the Private Securities Litigation Reform Act of 1995
("PSLRA") and Tellabs v. Makor Issues & Rights, Ltd., 551 U.S.
308 (2007) applies only to the element of scienter; all other
elements of a §10(b) claim are governed by traditional pleading
standards under Fed. R. Civ. P. 8(a) or 9(b). See In re PXRE
Group, Ltd. Sec. Litig., 600 F. Supp. 2d 510, 528-29 (S.D.N.Y.
2009). Rule 9(b) merely requires that the complaint "(1) specify
the statements that the plaintiff contends were fraudulent, (2)
identify the speaker, (3) state where and when the statement
were made, and (4) explain why the statements were fraudulent."
Rombach v. Chang, 355 F.3d 164, 170 (2d Cir. 2004) (internal
citations and quotation marks omitted). A plaintiff is not
required to plead evidence. See Skydell v. Ares-Serono S.A., 892
F. Supp. 498, 501 (S.D.N.Y. 1995).

IV.  **PLAINTIFFS FAIL TO ALLEGE A FEDERAL SECURITIES LAW VIOLATION**

A.  **Plaintiffs Have Not Adequately Pled the Elements of Their Securities Law Claims**

1.  **Plaintiffs Have Not Adequately Alleged Market Manipulation under Sections 9(a) and 10(b)**

Plaintiffs contend that Defendants as an undifferentiated group have "engaged in a massive, illegal stock market manipulation scheme." AC ¶ 2. Yet their AC does not allege actionable market manipulation under any provision of the federal securities laws. As the Supreme Court has stated, market manipulation is "virtually a term of art when used in connection with securities markets. It connotes intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 199 (1976). "General allegations not tied to the defendants or resting upon speculation are insufficient." ATSI Commc'ns Inc v. Shaar Fund, Ltd, 493 F.3d 87, 102 (2d Cir. 2007).

To state a claim for manipulation under Section 9(a)(1), plaintiffs must specifically identify particular wash sales or matched orders. 15 U.S.C. § 78i(a)(1)(A-C); see SEC v. Malenfant, 784 F. Supp. 141, 144 (S.D.N.Y. 1992). Similarly,

9

Section 9(a)(2) requires plaintiffs to identify transactions in a security creating actual or apparent trading in that security or raising or depressing the price of that security with the intent to deceive or defraud investors.  15 U.S.C. § 78i(a)(2); see Fezzani v. Bear, Stearns & Co., 384 F. Supp. 2d 618, 637 (S.D.N.Y. 2004).  Likewise, to state a manipulation claim under Section 10(b) and Rule 10b-5, plaintiffs must identify wash sales, matched orders, rigged prices, or some other manipulative act intended to mislead investors by artificially affecting market activity.  Santa Fe Indus. v. Green, 430 U.S. 462, 476 (1977).

Plaintiffs' broad and conclusory allegations of naked short selling do not state a claim for market manipulation.  The AC contains no allegations of wash transactions, matched orders or other similar activity, and does not assert that the parties to the alleged short sales were anything other than bona fide buyers and sellers trading at the reported price of the transaction.[3]  The fact that the seller was allegedly unable to

---

[3]Although Plaintiffs attach to the AC purported records of SulphCo trading activity and a list of dates on which SulphCo was deemed a "threshold" security, the AC does not explain how these items supposedly evidence that the Financial Institution Defendants engaged in manipulative "naked" short selling.  These exhibits identify no short sales effected by any Financial Institution Defendant, much less purportedly illegal "naked" short sales.  Indeed, the SEC has stated that a stock's inclusion on a "threshold" list "does not necessarily mean that any improper activity occurred or is occurring" because there are many reasons why a security might appear and

10

deliver the security on the settlement date—three days after the transaction—does not transform that legitimate sale into unlawful market manipulation.  Even when the seller is unable to deliver the stock on the settlement date, both parties obtain contractual settlement and still bear the market risk of the transaction.  This is far different from a wash sale or similar transaction in which a manipulator acts as both the buyer and seller in order to give the false appearance of actual trades without assuming any actual risk.  In ATSI, plaintiff similarly attempted to base an inference of manipulation "upon Depository Trust Company records showing that 8,256,493 shares [of ATSI] were traded in excess of settlements during [a] 10-day period." 493 F.3d at 104.  In upholding the dismissal of the manipulation claim, the Second Circuit concluded that "[t]he inference [plaintiff] asks us to draw is too speculative even on a motion to dismiss."  Id.

        As a result, allegations of failures to deliver, without more, are insufficient to state a claim for market manipulation.  Instead, "[t]o be actionable as a manipulative act, short selling must be willfully combined with something

remain on a "threshold" list.  SEC, Division of Market Regulation:  Key Points About Regulation SHO, available at http://www.sec.gov/spotlight/keyregshoissues.htm (Pepperman Decl Ex. D).

11

more to create a false impression of how market participants value a security." Id. at 101; see also Nanopierce Techs., Inc. v. Southridge Capital Mgmt., No. 02-CV-0767, 2008 U.S. Dist. LEXIS 34560, at *6 (S.D.N.Y. Apr. 21, 2008) ("Mere sales do not inject false information into the marketplace, nor can a party inject false information into the marketplace . . . simply by selling stock on the open market."). Here, the short selling activity alleged in the AC does not demonstrate that the Financial Institution Defendants distorted the price of SulphCo stock and does not constitute "willful conduct designed to deceive or defraud investors" with regard to market activity in SulphCo stock. Ernst & Ernst, 425 U.S. 185, 199 (1976).

Plaintiffs' general allegation that naked short selling resulted in the creation of "phantom shares" that artificially depressed the price of SulphCo stock (AC ¶¶ 40-41, 49) is also insufficient. In a release regarding Regulation SHO, the SEC expressly rejected the theory that naked short sales create "phantom" or "counterfeit" shares:

> Question 7.1: Do naked short sale transactions create "counterfeit shares?"
>
> Answer: Some believe that naked short sale transactions cause the number of shares trading to exceed the number of shares outstanding, which in turn allows broker-dealers to trade shares that don't exist. Others believe that the U.S. clearance and

12

settlement system, and specifically the National
Securities Clearing Corporation's ("NSCC") Continuous
Net Settlement System ("CNS"), produces "phantom" or
"counterfeit" securities by accounting for fails to
deliver.

> Naked short selling has no effect on an issuer's total
> shares outstanding.  There is significant confusion
> relating to the fact that the aggregate number of
> positions reflected in customer accounts at broker-
> dealers may in fact be greater than the number of
> securities issued and outstanding.  This is due in
> part to the fact that securities intermediaries, such
> as brokerdealers and banks, credit customer accounts
> prior to delivery of the securities.  For most
> securities trading in the U.S. market, delivery
> subsequently occurs as expected.  However, fails to
> deliver can occur for a variety of legitimate reasons,
> and flexibility is necessary in order to ensure an
> orderly market and to facilitate liquidity.
> Regulation SHO is intended to address the limited
> situations where fails are a potential problem (for
> example, fails in securities on a threshold list).

Pepperman Decl. Ex. A (emphasis added).  See also Pepperman

Decl. Ex. C at 16 ("The party failing to deliver continues to

have an obligation to deliver the shares.  This shift of

consequences does not (and cannot) increase the number of

securities issued. . . .").


        "Short selling—even in high volumes—is not, by itself,

manipulative.  Aside from providing market liquidity, short

selling enhances pricing efficiency by helping to move the

prices of overvalued securities toward their intrinsic values."

13

ATSI, 493 F.3d at 101 (internal citations omitted).[4]   In ATSI,
the Second Circuit upheld the dismissal of a market manipulation
claim based on short sales, holding that the "allegations fail
to state even roughly how many shares the defendants sold, when
they sold them, and why those sales caused the precipitous drop
in stock price."  Id. at 103.  The AC here similarly lacks such
details.  Aside from bald conclusions, there are no allegations
in the AC that the entirely undefined short selling alleged here
was manipulative in any respect, even assuming that the effect
of such trading was to depress the price of SulphCo stock.

        Plaintiffs also have failed to satisfy other threshold
requirements of Sections 9(a)(1) and 9(a)(2).  Plaintiffs
acknowledge that they must allege "a wash sale or matched orders
in a security" to state a claim under Section 9(a)(1).  (Opp'n ¶
23.)  They assert, however, that "the dates on which Naked Short
Selling took place" are "clear proof of existence of wash sales
and matched orders."  (Id.)  This assertion is incorrect.
Neither the Complaint nor Plaintiffs' Opposition identifies any

---

[4] As the Seventh Circuit explained in another market manipulation case
involving short sales, "we would think twice before concluding that [the
securities] laws prohibit 'schemes' that accelerate rather than retard the
convergence between the price of a stock and its underlying economic value
and therefore promote rather than impair the ultimate goals of public
regulation of the securities markets . . . . Far from launching a balloon,
[defendant's] short sales punctured a balloon, bringing prices down to earth
where they belonged."  Sullivan & Long, Inc. v. Scattered Corp., 47 F.3d 857,
861-62 (7th Cir. 1995).

14

dates on which any Financial Institution Defendant was involved
in "naked" short sales of SulphCo stock.  Further, Plaintiffs'
unsupported claim that "naked" short sales alone are "clear
proof" of wash sales and matched orders is erroneous.  A wash
sale is a "sale of securities made at about the same time as a
purchase of the same securities . . . resulting in no change of
beneficial ownership."  Black's Law Dictionary 1456 (9th ed.
2009).  A matched order is an "order to buy and sell at the best
price immediately available on the market."  Id. at 1208.  Wash
sales and matched orders are not the same things as "naked"
short sales.

          Plaintiffs also concede that they must allege "a
series of transactions in a security creating actual or apparent
trading in that security or raising or depressing the price of
that security" to state a claim under Section 9(a)(2).  (Opp'n
¶ 24.)  Plaintiffs contend that they have satisfied this element
of Section 9(a)(2) "through Exhibits A & B of the subject
Complaint."  (Id. ¶ 24.)  Those Exhibits, however, purport to
show nothing more than the price of SulphCo stock from 2004
through 2007 and the Reg. SHO Threshold List for selected dates
in 2005 and 2006.  They do not identify any transactions in
SulphCo stock, much less tie any of the Financial Institution

15

Defendants to those transactions, which is fatal to Plaintiffs'
claim under Section 9(a)(2).

Finally, Plaintiffs' Opposition brief points to no
wash sales, matched orders, rigged prices or other alleged
manipulative act intended to mislead investors.  Instead,
Plaintiffs again rely entirely on Exhibits A and B to the
Complaint, which purport merely to show the price of SulphCo
stock over time and the days on which SulphCo appeared on the
Threshold List.  (See id. ¶¶ 13, 14.)  Plaintiffs argue that
"taking a glance" at these Exhibits "clearly shows" market
manipulation by the Financial Institution Defendants.  (Id. ¶
27.)[5]  This is simply wrong.  A stock's presence on the Threshold
List "does not necessarily mean that any improper activity
occurred or is occurring" because there are many reasons why a
security might appear and remain on that list.  SEC, Division of
Market Regulation:  Key Points About Regulation SHO (Apr. 11,
2005) (Pepperman Decl. Ex. D).

---

[5] Without providing the Court with a copy of any decision, Plaintiffs attempt
to rely on a case pending in California state court "in which Overstock.com
is Plaintiff."  (Opp'n ¶ 2.)  They argue that this case "shows that Financial
Institution Defendants are habitual offenders and they should be punished."
(Id.)   The "Overstock.com case" involved different claims under California
state law and different allegations concerning the stock of a different
company, and thus has no relevance to the instant motion.   Reference to an
unrelated lawsuit in a different jurisdiction does nothing to support
Plaintiffs' claims in this action.

16

### 2. Plaintiffs Have Not Adequately Alleged Any Actionable Misrepresentations by the Financial Institution Defendants

To the extent that Plaintiffs are asserting a misrepresentation claim against the Financial Institution Defendants under Section 10(b) in addition to their manipulation clam, Plaintiffs fail to plead any facts connecting any supposed misrepresentation to any of the Financial Institution Defendants.

### i. Plaintiffs Have Not Pled Any Misrepresentations in an SEC Filing as Required by Section 18

Under Section 18 of the Exchange Act, a plaintiff must plead that "a document filed with the [SEC] contains a material misstatement or omission" and that the plaintiff relied on that misstatement or omission. See Ross v. A.H. Robbins Co., 607 F.2d 545, 556 (2d Cir. 1979). Plaintiffs have failed to identify any SEC filings in their AC, much less allege that a document filed with the SEC contained a material misstatement or omission. Nor have they alleged that they relied on any SEC filing by any entity. They have therefore failed to state a claim under Section 18.

17

ii.    **Plaintiffs Have Not Pled Any
Misstatements or Omissions
Attributable to Any Financial
Institution Defendant as Required
by Section 10(b)**

Under Section 10(b), a plaintiff must plead that the
defendant made a false statement or omitted a material fact.
See Stoneridge Inv. Partners LLC v. Scientific-Atlanta, 552 U.S.
148, 156 (2008); In re Tower Auto. Sec. Litig., 483 F. Supp. 2d
327, 333 (S.D.N.Y. 2007).  The defendant must actually make a
false and misleading statement, and the statement must be
attributable to the defendant at the time of its public
dissemination.   See Wright v. Ernst & Young LLP, 152 F.3d 169,
175-76 (2d Cir. 1998).  In Winkler v. Wigley, 242 F.3d 369 (2d
Cir. 2000) (unpublished opinion), for example, the Second
Circuit held that an outside public relations firm and an
outside director and shareholder could not be liable for
misleading statements contained in a company press release
because the misleading statements were made by, and attributed
to, the company's president.  Id. at *3. See also Steinberg v.
Sherman, No. 07-CV-1001, 2008 WL 2156726, at *4 (S.D.N.Y. May 8,
2008) (dismissing claims against individual defendants because
complaint failed to attribute misstatements specifically to
them); In re Parmalat Sec. Litig., 383 F. Supp. 2d 616, 623-24
(S.D.N.Y. 2005) (dismissing claims for failure to plead that

18

particular defendants participated in the making of the false
statement or that the false statement was attributed to them).

        Here, Plaintiffs have failed to identify any
misleading statements or omissions made by or attributed to any
Financial Institution Defendant.  Instead, Plaintiffs allege
that Tirman "bribed" a Barron's reporter, William Alpert, to
write an article that supposedly contained false statements,
some of which are attributed to an unidentified hedge fund.  AC
¶ 3.[6]  Plaintiffs do not allege that any of the Financial
Institution Defendants were even aware of the statements
contained in the article or knew that they were false.  Nor do
Plaintiffs identify any statements in the article that were
attributed in any way to any Financial Institution Defendant.
Plaintiffs instead simply assert, without any supporting factual
allegations, that the Financial Institution Defendants "worked
together with" Tirman and Stevanovich "without disclosing the
unscrupulous collaboration."  Id.  The AC does not allege any
facts describing how the parties supposedly worked together or
what the "unscrupulous collaboration" was.  Accordingly,

---

[6] Any federal securities claim predicated on the January 26, 2006 Barron's
article by William Alpert also is barred by the applicable statute of
limitations because the article was published more than two years before this
action was commenced.  See 15 U.S.C. § 78r(c); 28 U.S.C. § 1658(b); see also
Staehr v. Hartford Fin. Servs. Group, Inc., 547 F.3d 406, 411 (2d Cir. 2008)
(Section 10(b)); In re Alstrom SA Sec. Litig., 406 F. Supp. 2d 402, 419-20
(S.D.N.Y. 2005) (Section 18).

19

Plaintiffs have failed to plead facts to support their misrepresentation claims.

### 3. Plaintiffs Have Not Adequately Alleged Scienter for Purposes of Their Section 9(a) and 10(b) Claims

To plead a claim under Section 9(a) and Section 10(b), plaintiffs must "state with particularity facts giving rise to a strong inference that each defendant acted with scienter." Edison Fund v. Cogent Inv. Strategies Fund, Ltd., 551 F. Supp. 2d 210, 228 (S.D.N.Y. 2008) (internal quotation marks omitted); see also Crane Co. v. Westinghouse Air Brake Co., 419 F.2d 787, 794 (2d. Cir. 1969) ("Sections 9(a)(2) and 9(e) contain requirements of both manipulative motive and willfulness"). Scienter is a "'mental state embracing intent to deceive, manipulate or defraud.'" Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 319 (2007) (quoting Ernst & Ernst, 425 U.S. at 193 n.12). In deciding whether the allegations of the AC give rise to a "strong inference" of scienter, the Court must consider whether any allegations of scienter are "cogent and at least as compelling as any opposing inference of nonfraudulent intent." Tellabs, 551 U.S. at 314.

20

"Conclusory statements of associations" or generalized allegations of scienter against groups of defendants will not state a claim for securities fraud. Edison Fund, 551 F. Supp. 2d at 228; see also In re NovaGold Res. Inc. Sec. Litig., 629 F. Supp. 2d 272, 304 (S.D.N.Y. 2009). Plaintiffs must plead specific facts as to each defendant that (1) give rise to a strong inference that the defendant had both motive and opportunity to commit fraud or (2) provide strong circumstantial evidence of "conscious misbehavior or recklessness." Ganino v. Citizens Utils. Co., 228 F.3d 154, 168-69 (2d Cir. 2000) (internal quotation marks omitted); In re Tower Auto. Sec. Litig., 483 F. Supp. 2d at 336.[7] Plaintiffs fail to plead facts giving rise to either inference.

Plaintiffs' Opposition demonstrates that they rely almost entirely on Exhibits A and B to their Complaint to allege scienter. (See Opp'n ¶¶ 27, 38, 43.) Nothing about those Exhibits, however, remotely connects the Financial Institution Defendants to any misconduct, much less gives rise to the requisite "strong inference" that each of them acted with scienter. The Financial Institution Defendants are nowhere

---

[7] Recklessness satisfies the scienter requirement only where it is so severe that it "approximat[es] actual intent, and not merely a heightened form of negligence." Novak v. Kasaks, 216 F.3d 300, 312 (2d Cir. 2000).

21

mentioned in the Exhibits. Those entirely benign charts do not satisfy the PSLRA's requirements for pleading scienter.

Plaintiffs also argue that the Court can infer that certain unidentified "transactions were carried out with scienter because Defendants were having profits out of theses [sic] activity." (Opp'n ¶ 38; see also id. ¶ 41 ("Defendants engaged themselves in a series of transactions and illegal Naked Short Selling of SulphCo stock for over a period of year [sic] and made profits . . . .").) Leaving aside Plaintiffs' failure to identify any of the purportedly illegal transactions in which the Financial Institution Defendants supposedly engaged, a generalized motive to earn "profits" is insufficient to allege scienter. See Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc., 531 F.3d 190, 196-97 (2d Cir. 2008); Chill v. Gen. Elec. Co., 101 F.3d 263, 268 (2d Cir. 1996); In re Citigroup Auction Rate Sec. Litig., No. 08-CV-3095 (LTS), 2009 U.S. Dist. LEXIS 83046, at *19 (S.D.N.Y. Sept. 11, 2009).

With respect to the Barron's article, Plaintiffs assert, without any factual support, that "all Defendants knew" that the statements in Barron's were "false and immediately after publication of article they entered into series of transactions in high volumes and in the end failing to deliver

22

on settlement day." (Opp'n ¶ 45.) The Opposition does not
point to a single factual allegation suggesting that any
Financial Institution Defendant was aware of the Barron's
article, much less knew that it supposedly contained false
statements. And even if someone at one of the Financial
Institution Defendants did know that the Barron's article
contained a false statement, that fact alone would not give rise
to a "strong inference" that any Financial Institution Defendant
acted with "intent to deceive, manipulate or defraud." Tellabs,
551 U.S. at 314. Generalized allegations of scienter directed
at a group of defendants and based entirely on conclusory
statements are insufficient to state a claim for securities
fraud. See In re NovaGold Res. Inc. Sec. Litig., 629 F. Supp.
2d 272, 304 (S.D.N.Y. 2009); Edison Fund, 551 F. Supp. 2d at
228.

> **i. Plaintiffs Have Not Adequately
> Alleged That the Financial
> Institution Defendants Had a
> Motive to Commit Fraud**

To plead motive and opportunity to commit fraud,
Plaintiffs must allege, as to each defendant, that the defendant
would realize "concrete benefits" from the fraud. Suez Equity
Investors L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 100 (2d
Cir. 2001) (internal quotation marks omitted). Generalized

23

motives that could be attributed to any "for-profit endeavor"
will not suffice.  Chill v. Gen. Elec. Co., 101 F.3d 263, 268
(2d Cir. 1996); accord Teamsters Local 445 Freight Div. Pension
Fund v. Dynex Capital Inc., 531 F.3d 190, 196-97 (2d Cir. 2008);
Coates v. Heartland Wireless Commc'ns, Inc., 100 F. Supp. 2d
417, 431-32 (N.D. Tex. 2000) ("A generalized motive that 'could
be imputed to any publicly-owned, for-profit endeavor, is not
sufficiently concrete for purposes of inferring scienter.'").

          Here, Plaintiffs attempt to plead scienter by alleging
that the Financial Institution Defendants "were motivated . . .
to earn more money through the charging of fees, commissions
and/or interest," and that "Defendants" engaged in short selling
for profit in their own accounts.  AC ¶ 48.  These are exactly
the kinds of generalized profit-seeking motives that courts have
repeatedly rejected.  See Dynex, 531 F.3d at 196-97.  In Edison
Fund, for example, plaintiffs alleged that some of the
defendants, a hedge fund manager and member, failed to disclose
certain information about the performance of the fund because
the fund "paid the . . . Defendants extraordinarily high
management fees."  551 F. Supp. 2d at 227.  The Court dismissed
the claims against those defendants, explaining that "the desire
to earn management fees is a motive generally possessed by hedge
fund managers, and as such, does not suffice allege a 'concrete

24

and personal benefit' resulting from fraud." Id.  See also In re Citigroup Auction Rate Sec. Litig., No. 08-CV-3095, 2009 WL 2914370, at *6 (S.D.N.Y. Sept. 11, 2009) ("Courts have repeatedly rejected conclusory allegations regarding the motivation to earn unspecified fees as a basis for inferring scienter"); In re Salomon Analyst Winstar Litig., No. 02-CV-6171, 2006 WL 510526, at *10 (S.D.N.Y. Feb. 28, 2006) (because "all firms in the securities industry want to increase profits and all individuals are assumed to desire to increase their compensation," allegations of motive to increase revenues and worth are too generalized to allege scienter); Vogel v. Sands Bros. & Co., 126 F. Supp. 2d 730, 739 (S.D.N.Y. 2001) (plaintiff's "alleged desire to realize greater transaction fees" does not establish improper motive); In re Cree, Inc. Sec. Litig., 333 F. Supp. 2d 461, 476-77 (M.D.N.C. 2004) ("Allegations of heavy trading or large profits, without further information, do not satisfy the scienter requirement").

Moreover, Plaintiffs have completely failed to plead any particularized facts as to any specific defendant, instead lumping "Defendants" or "Defendant Broker/Dealers" together. These general allegations do not plead scienter against any of the Financial Institution Defendants.  See In re NovaGold, 629 F. Supp. 2d at 303-04.

### ii. Plaintiffs Have Not Adequately Alleged Conscious Wrongdoing or Recklessness

Plaintiffs also have failed to allege facts supporting a strong inference of conscious wrongdoing or recklessness, i.e., "deliberate illegal behavior" or conduct that was "highly unreasonable" and "an extreme departure from the standards of ordinary care." Novak, 216 F.3d at 308 (internal quotation marks omitted); see also In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 76 (2d Cir. 2001).

As to the short selling allegations, Plaintiffs have alleged only that Stevanovich and Tirman engaged in naked short selling of SulphCo stock and that "Defendant Broker/Dealers" as a group "intentionally fail[ed] to deliver stocks." AC ¶ 48. As previously discussed, the SEC has not imposed an outright prohibition on naked short selling, but rather has regulated the practice of selling short through Regulation SHO. Plaintiffs' allegations are insufficient to demonstrate either deliberate illegal conduct or highly unreasonable conduct representing an extreme departure from the standards of ordinary care by any of the Financial Institution Defendants. Moreover, Plaintiffs' assertions are not supported by any particularized factual allegations that might establish intentional wrongdoing. See In

26

re JP Morgan Chase Sec. Litig., 363 F. Supp. 2d 595, 624
(S.D.N.Y. 2005) (conclusory allegation that defendants received
"kickback[s]" insufficient to establish deliberately illegal
behavior).

As to the allegedly false statements made by Barron's,
Plaintiffs have not alleged that any of the Financial
Institution Defendants made these statements, knew that they
were false or even knew that the statements were being made.
Nor does the AC allege with any specificity what any Financial
Institution Defendant's supposed role was in the publication of
the challenged article.

Accordingly, Plaintiffs' claims under Sections 9(a)
and 10(b) are fail to plead scienter.

### 4. Plaintiffs Have Not Adequately Alleged Injury in Fact and Loss Causation

Plaintiffs have not pled facts supporting any legally
cognizable loss. Nor have they adequately alleged any "causal
connection between the [alleged manipulation or] material
misrepresentation and the loss." Dura Pharm., Inc. v. Broudo,
544 U.S. 336, 342 (2005). See also Fezzani, 384 F. Supp. 2d at
637 (under Section 9(a), manipulative act must have "affected

27

plaintiff's purchase or selling price") (internal quotation
marks omitted).  As the Second Circuit has held, a plaintiff
must "allege[] facts that would allow a factfinder to ascribe
some rough proportion of the whole loss to" the defendant's
misconduct.  Lattanzio v. Deloitte & Touche LLP, 476 F.3d 147,
158 (2d Cir. 2007); see also Citibank, N.A. v. K-H Corp., 968
F.2d 1489, 1497 (2d Cir. 1992) (holding that complaint failed to
allege loss causation where it alleged "in a conclusory fashion
. . . that 'there [was] a direct causal link between defendants'
fraud and Citibank's losses,'" and "[did] not detail how the
alleged fraud directly and proximately resulted" in plaintiff's
damage) (citations omitted).  Such allegations are entirely
missing here.

        The AC's allegations that "Defendants' wrongful
actions have resulted in substantial harm to Plaintiffs," all of
whom are "current or former" shareholders of SulphCo, are
entirely conclusory and do not plead injury in fact, let alone
loss causation, with the requisite specificity.  AC ¶¶ 6, 52-53.
Significantly, the AC does not allege that any particular
Plaintiff actually sold any SulphCo shares.  To the extent any
Plaintiff held his, her, or its shares throughout the relevant
time period, their claim that Financial Institution Defendants
somehow depressed the market price of SulphCo stock is too

                              28

speculative to measure and does not constitute a legally cognizable loss.  See Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 754-55 (1975); see also Chanoff v. United States Surgical Corp., 857 F. Supp. 1011, 1023 (D. Conn. 1994) (holding that so-called "holder" plaintiffs cannot maintain claim under federal securities laws).

Even assuming that some Plaintiffs sold some or all of their shares (a critical allegation that the AC never makes with respect to any particular Plaintiff), the AC does not allege that those shares were sold at a loss, let alone that any such loss was caused by any Financial Institution Defendant's supposed misconduct.  Plaintiffs are required to "allege facts indicating the economic loss they claim to have suffered," including "allegations as to the price each Plaintiff paid for the . . . stock or the date on which each Plaintiff purchased the stock."  Joffee v. Lehman Bros., Inc., 410 F. Supp. 2d 187, 192 (S.D.N.Y. 2006).  Although all of the information concerning Plaintiffs' stock transactions is plainly available to Plaintiffs, the AC fails to include this necessary information. Plaintiffs do not allege the amount of stock they purportedly sold, the date(s) on which the stock was sold, or the price initially paid and then received for any stock.  Instead, Plaintiffs rest on conclusory allegations that they as a group

29

either were precluded from selling their shares or were
otherwise constrained to sell their shares at a loss.  AC ¶¶ 6,
52-53.  As such, Plaintiffs have failed to plead any legally
cognizable loss.[8]

Given that Plaintiffs have not pled any actionable
loss, they have consequently also failed to allege facts
establishing loss causation.  See In re Citigroup Auction Rate
Sec. Litig., 2009 WL 2914370, at *8 (holding that because
"Plaintiff has failed to allege that he suffered any specific
economic harm as a result of Defendants' conduct . . . he has
not alleged loss causation sufficiently"); In re Forest Labs.
Sec. Litig., No. 05-CV-2827, 2006 WL 5616712, at *13 (S.D.N.Y.
July 21, 2006) (holding that plaintiffs failed to establish
causal link between fraud and fall in stock price where they did
not "point[] to any specific stock price reaction due to [the
misconduct]").  Plaintiffs' unsupported assertions that the
Financial Institution Defendants somehow artificially depressed
the price of SulphCo securities and thereby forced Plaintiffs to
sell their stock at a loss or otherwise hold on to their shares

---

[8] Because Plaintiffs allege that SulphCo stock has been artificially depressed
since 2004 (AC ¶ 2), Plaintiffs who bought after that point may have
benefited by purchasing their shares at a "bargain" price.  See Gurary v.
Winehouse, 190 F.3d 37, 46 (2d Cir. 1999) (explaining that if defendant's
actions depressed the share price, then plaintiff benefited from price
decline by purchasing shares at a lower price than plaintiff would have
otherwise paid).

at a diminished price are insufficient to "allow a factfinder to ascribe some rough proportion of the whole loss to" the Financial Institution Defendants' supposed misconduct. Lattanzio, 476 F.3d at 158.

Moreover, Twombly prohibits complaints that rely on "mere speculation," requiring plaintiffs to allege facts supporting a plausible—and not merely a possible—claim to relief. Yet the AC here fails to allege any facts that support Plaintiffs' contention that the Financial Institution Defendants' purported misconduct caused any so-called losses by Plaintiffs. In fact, Plaintiffs fail to allege even the most basic details of the Financial Institution Defendants' purported illegal short selling of SulphCo stock or identify any materially false or misleading statement in the Barron's article attributable to any Financial Institution Defendant. Such allegations are precisely the type of groundless claims that Twombly prohibits. Accordingly, Plaintiffs' securities law claims against the Financial Institution Defendants do not satisfy the loss causation requirement.[9]

---

[9] Although the Second Circuit has yet to decide whether loss causation must be pled with the specificity required by Rule 9(b), courts in this district, as well as the Fourth Circuit, have adopted the heightened pleading requirement. See In re Mutual Funds Inv. Litig., 566 F.3d 111, 120 (4th Cir. 2009) (holding that Rule 9(b) and the traditional pleading requirements for fraud claims apply to loss causation); Harrison v. Rubenstein, No. 02-CV-9356, 2007 WL 582955, at *14 (S.D.N.Y. Feb. 26, 2007) ("As with other aspects of

31

Plaintiffs do not dispute that their "Complaint does not identify which Plaintiffs sold [shares of SulphCo stock], how many shares were sold, when those shares were sold, the price they received, or whether those sales were at a loss." (Opp'n ¶ 7.) They instead argue that such allegations are "not appropriate at the initial stage of the case" and that they are "a matter of Discovery." (Id.; see also id. ¶ 50.) This is incorrect. To survive a motion to dismiss, Plaintiffs must "allege facts indicating the economic loss they claim to have suffered." Joffee v. Lehman Bros., Inc., 410 F. Supp. 2d 187, 192 (S.D.N.Y. 2006).[10] They have not even attempted to do so here, notwithstanding that all of the information concerning Plaintiffs' transactions in SulphCo stock is plainly available to them and thus need not await discovery. Nor can Plaintiffs defeat this motion simply by proclaiming that they have "claimed

---

securities fraud pleading, plaintiffs must allege specific facts to establish loss causation . . ."). Requiring that loss causation be pled under Rule 9(b) is consistent with the language of the rule itself, which requires that all circumstances of fraud, except for intent, be pled with particularity. In enacting the PSLRA, Congress specifically considered the pleading requirements for fraud, and amended how scienter must be pled, but did not do so for loss causation. While codifying loss causation as a statutorily required element of securities fraud, Congress discussed it as a "strong pleading requirement." S. Rep. No. 104-98, at 15 (1995) (placing discussion of loss causation under the heading "A strong pleading requirement," which begins with a description of Rule 9(b)).

[10] Plaintiffs' Opposition concedes that some undefined number of Plaintiffs still hold their shares of SulphCo stock. (Opp'n ¶ 54.) Those Plaintiffs who "decided to hold the stock" have not suffered any injury that is cognizable under the federal securities laws. See Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 754-55 (1975).

damages, both general and special, in the amount of One Billion

Dollars." (Opp'n ¶ 46.)  Plaintiffs have also failed to allege

any facts supporting their allegation that twelve individual

SulphCo shareholders have suffered damages "in the amount of One

Billion Dollars" based on their investment in a company with a

market capitalization far less than that amount.  Because

Plaintiffs have not adequately alleged that they suffered any

economic injury, they also have failed to allege loss causation,

a requisite element of their federal claims.  See Dura Pharm.,

Inc. v. Broudo, 544 U.S. 336, 342 (2005).[11]

### 5. Plaintiffs' Failure to Allege Reliance Is Fatal to Their Claims

The AC also fails to plead that Plaintiffs relied in

any way on Defendants' alleged wrongdoing.  This omission is

fatal to Plaintiffs' claims under Sections 9(a), 10(b) and 18 of

the Exchange Act.  See Stoneridge, 552 U.S. at 159 (Section

10(b)); ATSI Commc'ns Inc v. Shaar Fund, Ltd, 493 F.3d 87, 105-

08 (2d Cir. 2007)(manipulation claim under Section 10(b)); Baum

v. Phillips, Appel & Walden, Inc., 648 F. Supp. 1518, 1530

(S.D.N.Y. 1986) (Section 9); Stromfeld v. Great Atl. & Pac. Tea

---

[11] Plaintiffs contend that Dura is "not applicable to Plaintiffs' case" because "Plaintiffs are claiming deflated price of stock."  (Opp'n ¶ 47.) This is a distinction without a difference.  Dura requires a plaintiff to allege a "causal connection between the [alleged manipulation or] material misrepresentation and the loss" regardless of whether the alleged loss is based on an inflated or deflated share price.   Dura, 544 U.S. at 342.

Co., 484 F. Supp. 1264, 1268-69 (S.D.N.Y. 1980) (Section 18).
As the Supreme Court recently observed, "[reliance] ensures
that, for liability to arise, the 'requisite causal connection
between a defendant's misrepresentation and a plaintiff's
injury' exists as a predicate for liability." Stoneridge, 552
U.S. at 159 (citations omitted).

That connection is entirely missing here.  Indeed,
nowhere in the AC is there any mention that the Financial
Institution Defendants did anything that influenced Plaintiffs'
conduct.  Plaintiffs claim that they "were either precluded from
selling their stock or were forced to sell the stock at a
diminished price." AC ¶ 6.  But they never tie any of their own
actions to anything the Financial Institution Defendants
purportedly did.  As to the Plaintiffs who allegedly were
"precluded from selling their stock" altogether, the AC admits
that these Plaintiffs did not take any action and, therefore,
could not have relied on the Financial Institution Defendants'
alleged statements.  Moreover, because it is well-established
that the "[m]ere retention of securities during a period of an
alleged violation does not satisfy the [purchaser-seller]
requirement," Sanders v. Thrall Car Mfg. Co., 582 F. Supp. 945,

34

963 (S.D.N.Y. 1983) (internal quotation marks omitted), those Plaintiffs have pled themselves out of their claims.[12]

Nor can Plaintiffs invoke a presumption of reliance. To start, that presumption is not available for Section 18 claims. In re Alstrom SA Sec. Litig., 406 F. Supp. 2d 433, 479 (S.D.N.Y. 2005) ("Section 18 requires actual, or what has sometimes been referred to as 'eyeball,' reliance."). See also Heit v. Weitzen, 402 F.2d 909, 916 (2d Cir. 1968). For Section 9 and Section 10 claims, a rebuttable presumption of reliance may arise in only two circumstances: (1) when there is an omission of a material fact by one with a duty to disclose, and (2) under the fraud-on-the-market doctrine, when the statements at issue become public. See Stoneridge, 552 U.S. at 159. To invoke a presumption of "fraud on the market," a plaintiff must specifically plead that the market in which he or she purchased the shares was efficient, which the AC fails to do. See In re Citigroup, 2009 WL 2914370, at *7. Likewise, Plaintiffs do not allege that any of the Financial Institution Defendants had a duty to disclose a material fact, but failed to do so. To the

---

[12] It is well established under the Exchange Act that standing is limited to actual purchasers or sellers of securities. Blue Chip Stamps, 421 U.S. at 749; see Caiola v. Citibank, N.A., 295 F.3d 312, 321-22 (2d Cir. 2002). A plaintiff "may recover only for losses that result from decisions to buy or sell, not from decisions to hold or refrain from trading." First Equity Corp. of Fla. v. Standard & Poor's Corp., 869 F.2d 175, 180 n.2 (2d Cir. 1989); see also Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC, 446 F. Supp. 2d 163, 189-90 (S.D.N.Y. 2006).

contrary, Plaintiffs fail entirely to allege any link between the Financial Institution Defendants' purported actions and their own.

In their Opposition, Plaintiffs argue that "the SulphCo stockholders relied on the misstatement of Defendants which was published in the [Barron's] article and relying on that they started selling the stocks." (Opp'n ¶ 18.) They also assert that Plaintiffs' decisions to sell or hold their SulphCo shares were "influenced by Defendants [sic] conduct." (Id. ¶ 54.) As an initial matter, Plaintiffs have not identified any statement, much less a misstatement, by any Financial Institution Defendant in the Barron's article. More fundamentally, Plaintiffs' mere say-so in their Opposition that they relied on that article or were "influenced" by the Financial Institution Defendants' conduct, without anything more, is insufficient to allege reliance, which is fatal to all of Plaintiffs' claims under the federal securities laws. Nor can Plaintiffs avail themselves of a presumption of reliance. (Id. ¶ 53.) Again, the AC does not allege that any Financial Institution Defendant had a duty to disclose a material fact, but failed to do so, or that Plaintiffs purchased their SulphCo shares in an efficient market.

36

### 6. Plaintiffs' Reliance on "Aiding and Abetting" is Outdated and Misplaced

Plaintiffs' Opposition makes clear that they seek to rely on an aiding and abetting theory. (See Opp'n ¶¶ 30, 37, 43, 45, 55, 56.)   The Supreme Court, however, squarely rejected such a claim in Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 191 (1994), "hold[ing] that a private plaintiff may not maintain an aiding and abetting suit under § 10(b)."   As authority for their unfounded theory, Plaintiffs attempt to rely on some unspecified decision in the Enron litigation permitting the suit against the defendant banks to proceed.   (Opp'n ¶¶ 31-32.)   That reliance is misplaced. Following the Fifth Circuit's decision in Regents of the University of California v. Credit Suisse First Boston (USA), Inc., 482 F.3d 372 (5th Cir. 2007), and the Supreme Court's decision in Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. 148 (2008), the Enron court granted the banks' motion for summary judgment on the ground that the banks, as secondary actors, could not be liable under the securities laws.   In re Enron Corp. Sec., Derivative & ERISA Litig., 610 F. Supp. 2d 600, 607 (S.D. Tex. 2009).

## B. Plaintiffs Have Not Adequately Pled the Elements of Control Person Liability[13]

To state a claim under Section 20(a) of the Exchange
Act, Plaintiffs must allege "(1) a primary violation by the
controlled person, (2) control of the primary violator by the
defendant, and (3) that the defendant was, in a meaningful
sense, a culpable participant in the controlled person's fraud."
ATSI, 493 F.3d at 108; see also SEC v. First Jersey Sec., Inc.,
101 F.3d 1450, 1472 (2d Cir. 1996). Plaintiffs have failed to
satisfy any of these elements.

First, as discussed above, Plaintiffs have failed to
state an underlying primary violation of the federal securities
laws, which is grounds for dismissal of Plaintiffs' Section 20
claim against the Financial Institution Defendants. ECA & Local
134 IBEW Joint Pension Trust of Chicago v. JPMorgan Chase Co.,

---

[13] In their Opposition, Plaintiffs appear to confuse control person liability
under Section 20 with aiding and abetting liability under Section 10(b).
(See Opp'n ¶¶ 55-56.) As to the former, Plaintiffs must allege facts to
support the allegation that the Financial Institution Defendants "controlled"
a primary violator of the securities laws and "culpably participated" in such
a violation. See Edison Fund, 551 F. Supp. 2d at 231 (dismissing Section
20(a) claim where plaintiffs "do not allege particularized facts as to
[defendant's] participation in the fraud"); Cohen v. Citibank, N.A., 954 F.
Supp. 621, 630 (S.D.N.Y. 1996) (dismissing Section 20(b) claim because that
section "requires a showing that a 'controlling person knowingly used the
controlled person to commit the illegal act.'"). Plaintiffs allege no such
facts. As to the latter, as explained above, "a private plaintiff may not
maintain an aiding and abetting suit under § 10(b)." Central Bank of Denver,
511 U.S. at 191.[13]

38

553 F.3d 187, 207 (2d Cir. 2009); see also Bui v. Indus. Enters. of Am., 594 F. Supp. 2d 364, 372 (S.D.N.Y. 2009); Tabor v. Bodisen Biotech, Inc., 579 F. Supp. 2d 438, 453 (S.D.N.Y. 2008).

Second, the AC does not allege any facts to support the allegation that the Financial Institution Defendants "controlled" any primary violator of the securities laws.  To avoid dismissal, a "complaint must allege facts from which it can be inferred that the defendant had actual power or influence over the controlled person." Harrison, 2007 WL 582955, at *19. "[T]he Section 20(a) defendant must not only have actual control over the primary violator, but have 'actual control over the transaction in question.'" In re Alstrom SA Sec. Litig., 406 F. Supp. 2d at 487 (emphasis in original) (quoting In re Global Crossing Ltd. Sec. Litig., No. 02-CV-910, 2005 WL 1875445, at *3 (S.D.N.Y. Aug. 5, 2005)).  The AC here pleads no such facts. Instead, Plaintiffs baldly assert that the Financial Institution Defendants "controlled person and persons who aided and abetted violations of the above referenced laws," without ever identifying the "person and persons" whom the Financial Institution Defendants supposedly controlled.  AC ¶ 67.  Given the absence of any factual allegations from which it can be inferred that the Financial Institution Defendants had actual power or influence of a primary violator of the securities laws,

39

Plaintiffs' Section 20(a) claim is insufficient as a matter of law.

Finally, Plaintiffs fail adequately to plead that any Financial Institution Defendant culpably participated in any alleged fraud. To allege culpable participation, Plaintiffs must plead at a minimum particularized facts establishing a controlling person's conscious misbehavior or recklessness in the sense required by Section 10(b). See Kalin v. Xanboo, Inc., No. 04-CV-5931, 2009 WL 928279, at *12 (S.D.N.Y. Mar. 30, 2009); In re Alstrom SA Sec. Litig., 406 F. Supp. 2d at 490. Those allegations are entirely lacking here. See Edison Fund, 551 F. Supp. 2d at 231 (dismissing Section 20(a) claim where plaintiffs "do not allege particularized facts as to [defendant's] participation in the fraud").

## V. **PLAINTIFFS STATE LAW CLAIMS ARE DISMISSED**

### A. **The Court Does Not Have Diversity Jurisdiction Over Plaintiffs' State-Law Claims, and the Circumstances Do Not Warrant the Exercise of Supplemental Jurisdiction**

Plaintiffs also assert state-law claims against the Financial Institution Defendants for conspiracy and common law

40

fraud.  Plaintiffs wrongly allege that this Court has diversity
jurisdiction over these claims "because Plaintiffs and the
currently known Defendants are citizens of different states."
AC ¶ 33.


Under 28 U.S.C. § 1332(a), there must be "complete
diversity between all plaintiffs and all defendants" for
diversity jurisdiction to exist. Cushing v. Moore, 970 F.2d
1103, 1106 (2d Cir. 1992). Where any plaintiff is a citizen of
the same state as any defendant, diversity jurisdiction is
defeated. See Harsco Corp. v. Segui, 91 F.3d 337, 348 n.8 (2d
Cir. 1996). Here, it is clear from the face of the AC that
complete diversity does not exist. According to the AC,
plaintiff Vertical Ventures, LLC is "duly organized and existing
under and by virtue of the laws of the State of Delaware." AC ¶
13. The AC likewise alleges that ten of the Defendants are
"duly organized and existing under and by virtue of the laws of
the State of Delaware." Id. ¶¶ 21-30.[14] Accordingly, complete

---

[14] For purposes of diversity jurisdiction, "a corporation is deemed to be a
citizen of both the state in which it is incorporated and the state in which
it has its principal place." Universal Licensing Corp. v. Paola del Lungo
S.p.A., 293 F.3d 579, 581 (2d Cir. 2002) (citing 28 U.S.C. § 1332(c)(1)). It
is also noteworthy that the majority of the Plaintiffs claim to be residents
of New York. AC ¶¶ 7-10, 12, 14-17. Although the Complaint is silent about
the Defendants' principal places of business, many of the Financial
Institution Defendants have their principal places of business in New York.

41

diversity does not exist and diversity jurisdiction does not exist over Plaintiffs' state-law claims.

Nor will supplemental jurisdiction be exercised over Plaintiffs' state-law claims. "A district court may decline to exercise supplemental jurisdiction when it dismisses all claims over which it has original jurisdiction." Ernst & Co. v. Marine Midland Bank, N.A., 920 F. Supp. 58, 62 (S.D.N.Y. 1996) (citing 28 U.S.C. § 1367(c)(3)). The decision to exercise supplemental jurisdiction is at the discretion of the Court, and "when [federal] claims are dismissed before trial, the balance of factors will tilt towards declining to exercise jurisdiction." Shahzad v. H.J. Meyers & Co., 923 F. Supp. 57, 61 (S.D.N.Y. 1996). The presumption against exercising supplemental jurisdiction is particularly strong where, as here, the Court and the parties "have invested little effort on litigating the supplemental claims." 13D Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 3567.3 (3d ed. 2008); see also Alex. Brown & Sons Inc. v. Marine Midland Banks, Inc., No. 96-CV-2549, 1997 WL 97837, at *7 (S.D.N.Y. Mar. 6, 1997) (declining to exercise supplemental jurisdiction after federal securities claims dismissed as insufficiently pled).

## B. **Plaintiffs Fail to State a Claim for Common-Law Fraud or Conspiracy**

Even if supplemental jurisdiction over Plaintiffs' state-law claims was appropriate, those claims fail to state a claim under Rule 12(b)(6), Fed. R. Civ. P.  The elements of common-law fraud are "essentially the same" as those for a violation of Section 10(b) of the Exchange Act.  In re Pfizer Inc. Sec. Litig., 584 F. Supp. 2d 621, 643 (S.D.N.Y. 2008) (internal quotation marks omitted).  As held above, Plaintiffs have failed to allege essential elements of a fraud claim, including scienter, reliance and a material misrepresentation or omission.  Moreover, Plaintiffs have failed to allege fraud with the requisite particularity required by New York law.  See Callas v. Eisenberg, 595 N.Y.S.2d 775, 776 (App. Div. 1993) (fraud claim "should be dismissed as insufficient where the claim is unsupported by specific and detailed allegations of fact in the pleadings"); In re Pfizer Inc. Sec. Litig., 584 F. Supp. 2d at 644 (New York "continues to require that fraud claims allege reliance and be stated in detail.") (citation omitted).  Plaintiffs' vague and conclusory allegations of a "fraudulent scheme to deflate Sulphco's stock price" are insufficient to state a claim for fraud under New York law.  AC ¶ 78.

43

Because Plaintiffs have not stated a claim for fraud, their conspiracy claim also fails as a matter of law. A plaintiff must adequately allege a primary underlying tort to state a claim for civil conspiracy under New York law. See Best Cellars, Inc. v. Grape Finds at Dupont, Inc., 90 F. Supp. 2d 431, 446 (S.D.N.Y. 2000); see also Agostini v. Sobol, 757 N.Y.S.2d 555, 556 (App. Div. 2003) ("[C]onspiracy to commit a fraud is never of itself a cause of action"); Sokol v. Addison, 742 N.Y.S.2d 311, 312 (App. Div. 2002) (same). A claim for conspiracy also requires an alleged agreement between at least two defendants "to effectuate an unlawful purpose." Sluys v. Gribetz, 842 F. Supp. 764, 767 (S.D.N.Y.), aff'd, 41 F.3d 1503 (2d Cir. 1994). Other than general and conclusory allegations that certain unspecified defendants entered into a scheme to manipulate the price of SulphCo stock (AC ¶¶ 51, 71), Plaintiffs have failed to plead any facts establishing an agreement that includes the Financial Institution Defendants. With no adequate allegations of an agreement, Plaintiffs' claim for civil conspiracy should be dismissed for this additional reason as well. See NCA Holding Corp. v. Ernestus, No. 97-CV-1372, 1999 WL 672836, at *3 (S.D.N.Y. Aug. 27, 1999) ("apart from a conclusory allegation, plaintiffs had failed to allege any facts from which the Court [could] determine that there was any common

44

plan or scheme linking the different transactions and defendants together") (internal quotation marks omitted); Portnoy v. Am. Tobacco Co., Nos. 96/16323, 2-MG, 96-16324, 1997 WL 638800, at *7 (Sup. Ct. N.Y. County Sept. 27, 1997) (dismissing conspiracy claim where allegations of an agreement were "purely conclusory"). The conspiracy claim against the Financial Institution Defendants is therefore dismissed.

## VI.  CONCLUSION

For the foregoing reasons, the AC is dismissed and the Plaintiffs are granted leave to replead.

It is so ordered.

New York, NY
June 23 , 2010

ROBERT W. SWEET
U.S.D.J.

45